## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No._____

HARTFORD ACCIDENT AND INDEMNITY COMPANY,

      Plaintiff,

vs.

ROBERT M. FRIEDLAND, OLD REPUBLIC INSURANCE COMPANY, and
INTERNATIONAL INSURANCE COMPANY,

      Defendants,

---

## COMPLAINT
## JURY TRIAL DEMANDED

---

Plaintiff Hartford Accident and Indemnity Company ("Hartford") hereby brings this

Complaint to seek a Declaratory Judgment against the Defendants as follows:

### I.      STATEMENT OF THE CASE

1.      Pursuant to Fed. R. Civ. P. 57, Hartford seeks declaratory relief regarding the

rights and obligations of the parties to this case under certain comprehensive general liability

insurance policies issued by Hartford and defendants Old Republic Insurance Company ("Old

Republic") and International Insurance Company ("International") to certain corporate entities

allegedly controlled by defendant Robert M. Friedland.  Mr. Friedland has sought coverage

under the policies issued by Hartford for investigation, defense and liability costs he incurred as

the result of lawsuits brought against him for environmental contamination arising from the

construction, operation, and abandonment of the Summitville Mine project in Rio Grande County, Colorado.

## II.   JURISDICTION

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.  An actual and justiciable controversy exists between and among the parties relating to their respective rights and obligations under certain comprehensive general liability insurance policies issued by Hartford, Old Republic, and International relating to claims against Mr. Friedland arising out of environmental contamination at the Summitville Mine project in Rio Grande County, Colorado.

3.      Hartford is a Connecticut corporation, with its principal place of business in Hartford, Connecticut.

4.      Defendant Robert M. Friedland is a natural person who is a United States citizen who, on information and belief, currently resides in Singapore.  He is subject to the personal jurisdiction of this Court pursuant to C.R.S. § 13-1-124, due to his substantial contacts with the State of Colorado including, but not limited to, his status at various times as a director, officer, employee or agent of Summitville Consolidated Mining Company, Inc., a now-defunct Colorado corporation that was responsible for the design, construction, operation and abandonment of the Summitville Mine, and his status as a plaintiff in numerous lawsuits brought in Colorado courts against contractors and other entities involved in the design, construction and operation of the Summitville Mine.

\\\DC - 002376/000701 - 2720654 v2

5.      Old Republic Insurance Company is a Pennsylvania corporation, with its principal place of business in Greensburg, Pennsylvania.   Old Republic is subject to the personal jurisdiction of this Court by virtue of its contracting to insure any person, property or risk residing or located within this state at the time of contracting, and the transaction of any business within this state.   Old Republic is or was licensed to do business in the State of Colorado, has consented to the jurisdiction of this Court, or both.

6.      On information and belief, International Insurance Company is an Illinois corporation with its principal place of business in Chicago, Illinois.   International is subject to the personal jurisdiction of this Court by virtue of its contracting to insure any person, property or risk residing or located within this state at the time of contracting, and the transaction of any business within this state.   International is or was licensed to do business in the State of Colorado, has consented to the jurisdiction of this Court, or both.

7.      Venue is proper over this action pursuant to 28 U.S.C. § 1391(a)(2).

### III.    PARTIES

8.      Hartford is, and at all relevant times was, in the business of issuing commercial liability insurance policies.

9.      Defendant Robert M. Friedland was at all relevant times a director, officer, employee or agent of Summitville Consolidated Mining Company, Inc. ("SCMCI"), a now-defunct Colorado corporation that was responsible for the design, construction, operation and abandonment of the Summitville Mine.  On information and belief, SCMCI was at all relevant times a wholly-owned subsidiary of Galactic Resources, Inc. ("GRI"), an Oregon corporation. Mr. Friedland was at all relevant times a director, officer, employee or agent of GRI.  On

\\\DC - 002376/000701 - 2720654 v2

information and belief, GRI is now defunct.  On information and belief, GRI was at all relevant

times a wholly-owned subsidiary of Galactic Resources, Ltd. ("GRL"), a Canadian corporation

organized under the laws of British Columbia.  Mr. Friedland was at all relevant times a director,

officer, employee or agent of GRL.  On information and belief, GRL is now defunct.  SCMCI,

GRI, and GRL will be referred to collectively as the "Galactic Entities" in this Complaint.

10.     Old Republic is, and at all relevant times was, in the business of issuing

commercial general liability insurance policies, including policies issued to the Galactic Entities.

11.     International, is and at all relevant times was, in the business of issuing

commercial general liability insurance policies, including policies issued to the Galactic Entities.

## IV.     FACTUAL ALLEGATIONS

12.     Beginning in 1984, GRI and SCMCI leased the property on which the

Summitville Mine project was to be developed.  The Summitville Mine is located in the

Summitville Mining District at the headwaters of the Rio Grande on the northeast flank of South

Mountain within the San Juan Mountain Range.  The mine site covers approximately 1,400 acres

ranging in altitude from 11,400 to 12,500 feet, and is located approximately 25 miles southwest

of Del Norte, Rio Grande County, Colorado.  It is located within two miles of the Continental

Divide and is subject to severe weather, including heavy winter snows.

13.     Although gold mining has taken place at the Summitville site since at least 1870,

the development of the Summitville Mine project by the Galactic Entities was to represent a

substantial increase in the size and intensity of mining activity that had occurred historically.

The original permit application that was submitted to the Colorado Mined Land Reclamation

Division (MLRD) in 1984 was for a pilot project designed to test the feasibility of extracting

4

gold utilizing a cyanide heap leaching process.  The MLRD issued a permit (the "110 permit")

for the pilot project in May 1984.

14.     The cyanide heap leaching process, described in its simplest terms, consists of a

large quantity of mineral-bearing ore, crushed to varying degrees, being laid upon an

impermeable layer of clay and textile (the "heap leach pad").  This ore is then sprayed with a

cyanide-bearing solution which percolates through the ore and leaches gold out of the ore.  This

solution is collected at the base of the heap leach pad, and then processed to recover the gold.

15.     The Summitville Mine was originally designed as a "zero-discharge" facility, *i.e.*,

it was envisioned that the cyanide-bearing solution would remain in the leach pad for the life of

the project, and therefore a permit would not be needed to authorize discharge of these pollutants

to the Alamosa River.  To prevent the "water balance" in the heap leach pad from being

overwhelmed by outside sources and causing it to overflow, a design decision was made to divert

runoff from other sources around the heap leach pad.  This decision was motivated in whole or in

part by recognition that several of the sources of runoff in the vicinity of the Summitville Mine

generated acid rock drainage ("ARD"), which would have required treatment before being

discharged into the Alamosa River.

16.     As the pilot project proceeded, SCMCI/GRI submitted an application on August

31, 1984 for a large-scale cyanide heap leaching operation at the Summitville site.  The MLRD

approved SCMCI's/GRI's application in October 1984 and issued a permit for full-scale mining

operations on October 25, 1984 (the "112 permit").  Construction of the mine, including the heap

leach pad and liner, commenced in August 1985 and continued through the winter.

\\\DC - 002376/000701 - 2720654 v2

17.     The heap leach pad liner for the full-scale project was composed of a geotextile liner on top of an impermeable plastic membrane (the upper or primary liner), which in turn was underlain by a sand layer.  The sand layer incorporated a leak detection system and was underlain by an impermeable clay liner (the lower or secondary liner).  A French drain system, consisting of crushed rock, collected groundwater that flowed under the clay liner and discharged it to Cropsy Creek, then into Wightman Fork and then into the Alamosa River.  The purpose of the plastic liner, in addition to permitting the collection of the gold-bearing cyanide solution for processing, was to prevent the solution from entering into the surrounding environment.

18.     SCMCI/GRI encountered difficulties during the winter construction season of 1985-86, which resulted in the original plastic liner being ripped and torn.  SCMCI/GRI engaged another contractor to install a replacement plastic liner prior to loading the heap leach pad with ore.  However, snow slides and snowmelt during the winter and spring of 1986 caused damage to, and undermined soils beneath, the plastic liner.  Leaks of the cyanide-bearing solution were detected by Summitville personnel between the upper and lower liners within a week after SCMCI/GRI began heap leaching operations on or about June 5, 1986.  The State of Colorado was informed of the leaks from the upper liner on or about June 11, 1986.

19.     Analysis of a sample collected from the French drain (beneath the clay liner) on or about June 18, 1986, revealed leakage of the cyanide solution through the secondary layer as well.  This leakage was reported to the State of Colorado on or about July 15, 1986.  This report was considered significant by both the State and the mine's management because it indicated that cyanide was leaking through both the primary and secondary liners, and was eventually discharging to the Alamosa River.

6

20.     Mr. Friedland was personally notified of these leaks on or about July 15, 1986. Shortly afterward, he traveled from Vancouver, British Columbia, Canada to Denver to meet with legal counsel for SCMCI/GRI, and with staff of the Colorado Mined Land Reclamation Board ("MLRB"). Following those meetings, Mr. Friedland also appeared at a public hearing held by the MLRB, during which the reported cyanide leakage from the Summitville Mine was discussed, as well as SCMCI/GRI's response to the leakage. Following those meetings and hearings, SCMCI/GRI proposed to route the drainage from the French drain back into the heap leach pad.

21.     Routing the drainage from the French drain served only to overwhelm the "water balance" in the heap leach pad, with the result that the volume of water in the heap leach pad was very nearly overtopping the containment dike of the pad when mining operations ceased at the Summitville Mine in 1992. In addition, the "water balances" performed during the mine's design phase assumed that the heap leach pad would be covered during winter, thereby preventing the subsequent snowmelt from accumulating in the pad. In practice, however, SCMCI/GRI opted to not cover the heap leach pad during winter, and the snowmelt added a significant volume of water to the pad that was not included in the original "water balance."

22.     Over the life of the Summitville Mine project, approximately ten million tons of gold- and silver-bearing ore were mined, crushed and placed on the heap leach pad. When waste rock from these operations was placed on the Cropsy Waste Pile, located upstream of the heap leach pad, excess ARD generated from this pile was added to the leach pad. This not only added to the increasing water imbalance in the leach pad, but the ARD chemistry also affected the efficiency of the cyanide leaching process, and led to a decrease in metals recovery.

7

23.    Beginning in June 1987, the Summitville Mine experienced a series of "system failures" that resulted in the discharge of cyanide-contaminated water either directly into Cropsy Creek or into settling ponds on site.  Both the Colorado Water Quality Control Division and the MLRB issued Notices of Violation to SCMCI/GRI with regard to these discharges.

24.    SCMCI/GRI began construction of a water treatment plant in April 1989, but by June 1989 it was apparent that the water treatment plant was not accomplishing its design task. In particular, the system's discharge did not meet state limits for silver effluent.

25.    On May 15, 1989, SCMCI/GRI submitted a request to the MLRB for permission to start land application of treated water.  The theory was that treated water would infiltrate into the soil and not become runoff into the surface waters.  The land application system also failed, and eventually the Summitville Mine was issued a Notice of Violation and a cease-and-desist order in February 1991, because the water from the treatment system was being "land applied in a manner which resulted in overland flow to Wightman Fork."

26.    On or about December 3, 1992, SCMCI announced that it intended to file for bankruptcy and informed the State of Colorado that site operations would not continue beyond December 4, 1992.  On or about December 4, 1992, the State of Colorado requested emergency response assistance from the U.S. Environmental Protection Agency ("EPA").

27.    On or about December 16, 1992, the EPA Region 8 Emergency Response Branch assumed control of the Summitville Mine site and began water treatment plant modifications to treat cyanide-contaminated leachate from the heap leach pad and ARD from various sumps, waste piles and adits on the Site.  The Summitville Mine site was added to the National Priority

8

List of hazardous waste sites on May 31, 1994.  In the following years, the EPA and the State of Colorado incurred substantial costs in cleaning up contamination at the Summitville Mine site.

28.     On or about May 23, 1996, the United States and the State of Colorado filed a civil action in this Court against Mr. Friedland and other potentially responsible parties, seeking the recovery of response costs incurred in cleaning up the Summitville Mine site pursuant to the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") (the "Pollution Claims").  United States and State of Colorado v. Robert M. Friedland v. Bechtel Corp., et al., No. 96-N-1213 (D. Colo.).

29.     On December 22, 2000, Mr. Friedland entered into a Settlement Agreement and Consent decree with the United States and the State of Colorado to resolve the governments' claims against him, and also a counterclaim brought by Mr. Friedland (the "Settlement Agreement").  Under the terms of this settlement, Mr. Friedland eventually reportedly paid $20,288,081.

30.     Approximately two and a half years later, on May 20, 2003, Mr. Friedland first notified Hartford of the Pollution Claims, outlined his December 2000 settlement with the United States and the State of Colorado, and demanded coverage under three excess insurance policies issued by Hartford to the Galactic Entities for the sums paid in settlement of the Pollution Claims, and also for approximately $28.5 million in legal fees and costs incurred in defending against the Pollution Claims.

## V.     INSURANCE POLICIES AT ISSUE

31.     On information and belief, Old Republic issued Policy No. Z-39458 to SCMCI, effective from September 24, 1986 to September 24, 1987.  This commercial general liability ("CGL") policy provided primary coverage with limits of $1 million per occurrence, $1 million aggregate.

32.     International issued Policy No. 5234248899 to SCMCI, effective from September 24, 1986 to September 24, 1987.  This CGL policy provided coverage with limits of $2 million per occurrence, $2 million aggregate, in excess of $1 million underlying coverage.

33.     Hartford issued excess insurance Policy No. 46 XS SG3061 to Galactic Resources, Ltd., doing business as SCMCI, effective from September 30, 1986 to September 24, 1987.  This excess liability policy provided coverage with limits of $3 million per occurrence, $3 million aggregate, in excess of underlying coverage.  This policy does not include an obligation to pay defense costs.

34.     Old Republic issued Policy No. ZY51961 to Galactic Resources, Ltd., doing business as SCMCI, effective from September 24, 1987 to September 24, 1988.  This CGL policy provided primary coverage with limits of $1 million per occurrence, $2 million aggregate.

35.     International issued Policy No. 523-491364-8 to SCMCI, effective from September 24, 1987 to September 24, 1988.  This CGL policy provided coverage with limits of $5 million per occurrence, $5 million aggregate, in excess of $1 million underlying coverage.

36.     Hartford issued excess insurance Policy No. 46 XS SG7373 to Galactic Resources, Ltd., doing business as SCMCI, effective from September 24, 1987 to September 24, 1988. This excess liability policy provided coverage with limits of $5 million per occurrence, $5

\\\DC - 002376/000701 - 2720654 v2

million aggregate, in excess of underlying coverage.  This policy does not include an obligation to pay defense costs.

37.     Old Republic issued Policy No. ZY52380 to Galactic Resources, Ltd., doing business as SCMCI, effective from September 24, 1988 to September 24, 1989.  This CGL policy provided primary coverage with limits of $1 million per occurrence, $2 million aggregate.

38.     On information and belief, International issued Policy No. 524-202346-8 to SCMCI, effective from September 24, 1988 to September 24, 1989.  This CGL policy provided coverage with limits of $5 million per occurrence, $5 million aggregate, in excess of $1 million underlying coverage.

39.     Hartford issued excess insurance Policy No. 46 XS SG9345 to Galactic Resources, Ltd., doing business as SCMCI, effective from September 24, 1988 to September 24, 1989.  This excess liability provided coverage with limits of $5 million per occurrence, $5 million aggregate, in excess of underlying coverage.  This policy does not include an obligation to pay defense costs.

## VI.     RELEVANT PROVISIONS OF HARTFORD POLICIES

40.     The basic provisions outlining the coverage provided by Hartford are found in the Hartford excess liability policies.  In pertinent part, the policies include the provisions set forth below.

41.     Under the Insuring Agreement of its excess liability policies, Hartford is only obligated to indemnify the insured for "the ultimate net loss in excess of underlying insurance…."

11

\\\DC - 002376/000701 - 2720654 v2

42.     "Ultimate net loss" is defined in the policies as "the total of all sums which the insured, or any organization as its insurers, or both, shall become legally obligated to pay, whether by reason of adjudication or settlement, because of an occurrence covered under the terms of the controlling underlying insurance policy and to which this policy applies"; but "ultimate net loss . . . shall not include . . . (b) costs."

43.     The term "costs" is defined to include "investigation, adjustment and legal expenses."

44.     The term "underlying insurance" is defined in the policies as follows:

> "[U]nderlying insurance," means the primary or excess insurance policies contributing to the total limit stated in item 5 of the declarations (including any deductible amount, insured's participation or self insured retention beneath any such policy) and includes any renewals or replacements thereof.  The limits of such policies shall be deemed applicable regardless of (1) any defense which the underlying insured may assert, (2) the insured's failure to comply with any condition of such policy or (3) the insolvency of the underlying insurer.

45.     Under the terms and conditions of the Hartford excess policies, Hartford's duty regarding investigation, defense, and settlement of claims is described as follows:

> The company shall not be obligated to assume charge of the investigation, defense or settlement of any claim or suit against the insured, but the company shall have the right and shall be given the

12

opportunity to associate with the insured or its underlying insurers,
or both, in the investigation, defense or settlement of any claim or
suit which, in the opinion of the company, involves or appears
reasonably likely to involve the company.

46.     Under the terms and conditions of Hartford's excess policies, an "occurrence" is
defined as "an accident or occurrence as defined in and covered by the controlling underlying
insurance policy designated in the declarations."    The definition of "occurrence" in the
"controlling underlying insurance policy," identified as the International Insurance policy
underlying each of the Hartford excess policies, is as follows:

"Occurrence" means:

(a)  with respect to Bodily Injury Liability or Property Damage
Liability, injurious exposure to conditions which results in Bodily
Injury or Property Damage neither expected nor intended from the
standpoint of the insured.   All damages arising out of such
exposure to substantially the same general conditions shall be
considered as arising out of one occurrence.

47.     Each of the Hartford excess policies also contains the following conditions
precedent to coverage:

3.  Notice of Occurrence

Whenever it appears that there is an occurrence that is likely to
involve indemnity under this policy, written notice thereof shall be

13

given to the company or any of its authorized agents as soon as practicable. . .

\* \* \*

4.  Action Against Company

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial, or by written agreement of the insured, the claimant and the company.

\* \* \*

7.  Assistance and Cooperation of the Insured

The insured shall cooperate with the company and with the underlying insurers as required by the terms of the controlling underlying insurance policy and comply with the all of the terms and conditions therof . . .

48.     Each of the Hartford excess policies contains applicable mining, pollution and care, custody or control exclusions.  For example, Policy No. 46 XS SG3061 contains a "Pollution Hazard Exclusion" that provides that "each and every exclusion forming a part of the policy and relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants is replaced by the following exclusion:"

14

The company shall have no obligation under this policy:

(1)  to investigate, settle, or defend any claim or suit against any insured alleging actual or threatened injury or damage of any nature or kind to persons or property which arises out of or would not have occurred but for the pollution hazard; or

(2)  to pay any damages, judgments, settlements, loss, or expenses that may be awarded or incurred by reason of any such claim or suit or any such injury or damage, or in complying with any action authorized by law and relating to such injury or damage.

As used in this endorsement, "pollution hazard" means an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties of any solid, liquid, gaseous or thermal pollutants, contaminants, irritants or toxic substances, including smoke, vapors, soot, fumes, acids or alkalis, and waste materials consisting of or containing any of the foregoing.

## **FIRST CLAIM FOR RELIEF**

### **No Obligation to Defend or to Pay Defense Costs**

49.  Hartford refers to the allegations set forth in Paragraphs 1 through 48 of this Complaint and re-alleges and reincorporates them as if fully set forth herein.

50.  Hartford seeks a declaration that it has no obligation under its policies to defend Friedland or to pay defense costs incurred in connection with the Pollution Claims.

\\\DC - 002376/000701 - 2720654 v2

## SECOND CLAIM FOR RELIEF

### No Obligation to Indemnify—Pollution Claims Not Covered

51.     Hartford refers to the allegations set forth in Paragraphs 1 through 48 of this Complaint and re-alleges and reincorporates them as if fully set forth herein.

52.     Hartford seeks a declaration that its policies do not cover the Pollution Claims and, accordingly, Hartford has no obligations under its policies to indemnify Friedland for the Settlement Agreement, or for any other settlements entered into by Friedland relating to the Pollution Claims.

## THIRD CLAIM FOR RELIEF

### No Obligation to Indemnify—Friedland Failed to Satisfy Conditions to Coverage

53.     Hartford refers to the allegations set forth in Paragraphs 1 through 48 of this Complaint and re-alleges and reincorporates them as if fully set forth herein.

54.     Hartford has no obligation to indemnify Friedland for the Settlement Agreement (or for any other settlements entered into by Friedland relating to the Pollution Claims) because Friedland failed to satisfy the Hartford policies' conditions for coverage, including without limitation:  (i) the duty to provide written notice of occurrence; (ii) the duty to obtain Hartford's consent to any settlement implicating its coverage; and (iii) the duty to cooperate with Hartford in the defense of claims.

55.     Accordingly, Hartford seeks a declaration that Hartford has no coverage obligations for the Settlement Agreement because Friedland failed to satisfy the Hartford policies' conditions to coverage.

16

## **FOURTH CLAIM FOR RELIEF**

**No Obligation to Indemnify—Failure to Exhaust Underlying Coverage/Allocation**

56.     Hartford refers to the allegations set forth in Paragraphs 1 through 48 of this Complaint and re-alleges and reincorporates them as if fully set forth herein.

57.     The Hartford policies provide coverage to persons qualifying as insureds for covered claims subject to the policies' terms, conditions, attachment points, limits, exclusions, and endorsements.

58.     Hartford has no potential obligations under its policies for covered claims until underlying coverage has been properly exhausted and the attachment points of the Hartford policies have been reached.  Further, if and when underlying coverage is exhausted and those attachment points are reached, Hartford's obligations to pay indemnity costs incurred on account of covered claims is limited to its appropriate pro rata share up to the limits of liability of its policies.  Hartford is not obligated to pay defense or indemnity cost allocable to periods in which its insured is uninsured or insured under policies issued by another insurer.

59.     If the amount of the Settlement Agreement is properly allocated across all implicated policy periods, underlying coverage has not been exhausted and the attachments points of the Hartford policies have not been reached.  Accordingly, Hartford seeks a declaration that Hartford has no coverage obligations for the Settlement Agreement because underlying coverage has not been exhausted and the attachment points of the Hartford policies have not been reached.

\\\DC - 002376/000701 - 2720654 v2

## FIFTH CLAIM FOR RELIEF

### Contribution (or other similar relief)

60.     Hartford refers to the allegations set forth in Paragraphs 1 through 48 of this Complaint and re-alleges and reincorporates them as if fully set forth herein.

61.     To the extent Hartford is required to pay more than its appropriate pro rata share of defense or indemnity costs incurred by Friedland in connection with the Settlement Agreement, Hartford is entitled to reimbursement/offset from Friedland, Old Republic and/or International in an amount equal to those costs allocable to those respective parties.

## PRAYER FOR RELIEF

Wherefore, Hartford Accident and Indemnity Company prays for relief as follows:

62.     For a declaration that Hartford has no obligation under its insurance policies to reimburse Mr. Friedland, or any of the Galactic Entities, for defense or indemnity costs with respect to the Summitville Mine site.

63.     Alternatively, in the event Hartford is found to have obligations for defense or indemnity costs with respect to the Summitville Mine site and it is required to pay more than its appropriate pro rata share, for reimbursement/offset from Friedland, Old Republic and/or International in an amount equal to those costs allocable to those respective parties.

64.     For recovery of all fees and costs, including reasonable attorneys' fees, incurred in the prosecution of this lawsuit as the law may allow; and

65.     For such other and further relief as the Court deems just and equitable.


**PLAINTIFF DEMANDS A JURY TRIAL ON ALL CLAIMS SO TRIABLE**


18

Dated: May 1, 2008.

        HOGAN & HARTSON LLP

        s/Eric J. Moutz

        Cynthia A. Mitchell, #21974
        Eric J. Moutz, #34617
        1470 Walnut Street, Suite 200
        Boulder, CO  80302
        cmitchell@hhlaw.com
        ejmoutz@hhlaw.com
        Phone (720) 406-5300
        Fax (720 406-5301

        HOGAN & HARTSON LLP
        555 Thirteenth St., N.W.
        Washington, DC  20004

        FORSBERG & UMLAUF, P.S.
        901 Fifth Avenue, Suite 700
        Seattle, WA  98164

        Attorneys for Plaintiff HARTFORD ACCIDENT AND
        INDEMNITY COMPANY